BARNHILL, J., dissents in part.
For ease of narration, the plaintiff, Deward C. Thomas, and the defendants, Joseph Winstead Watson and Lynwood C. Dorman, are herein called by their respective surnames.
These two actions arose out of a collision between the southbound Plymouth coupe of Watson and the northbound tractor-trailer combination of the Thurston Motor Lines, a domestic corporation. Watson drove the Plymouth, and Thomas, his gratuitous guest, rode beside him on the right side of the seat. Dorman, a chauffeur regularly employed by Thurston Motor Lines, was operating the tractor and trailer on a mission for his employer. The Plymouth and the trailer sustained substantial damage, and Thomas and Watson suffered serious personal injuries.
In the first case, Thomas, as plaintiff, sued Thurston Motor Lines and Dorman, as defendants, for personal injuries. Thurston Motor Lines and Dorman denied liability to Thomas, alleging that his injuries resulted solely from the negligent conduct of Watson. Moreover, they procured an order of court making Watson a party defendant, and prayed for contribution from him as joint tort-feasor in the event of any recovery by Thomas against them. Watson denied liability for contribution, and counterclaimed against Thurston Motor Lines and Dorman for injury to his person and damage to his automobile, and they pleaded contributory negligence on his part as a bar to his counterclaim. In the second *Page 125 
action, Thurston Motor Lines, as plaintiff, sued Watson, as defendant, for damage to its trailer, and Watson renewed his counterclaim against Thurston Motor Lines, which reiterated its plea of contributory negligence against him.
By the implied consent of the parties, the court consolidated the actions for trial and judgment. All of the parties presented testimony, which was received without objection.
There was practically no disagreement in the evidence of the several parties relating to the matters set out in the next three paragraphs.
The collision occurred about 3:45 o'clock in the morning of 8 March, 1947, upon United States Highway No. 301 within the municipal limits of Rocky Mount, North Carolina. The road ran north and south, and was relatively level and straight. It was paved to a width of 22 feet, and a center line divided it into northbound and southbound traffic lanes. The night was cold, dark, and stormy. A heavy mixture of rain and sleet was descending, limiting the vision of motorists and rendering the surface of the roadway somewhat icy.
The over-all length of the tractor-trailer combination was approximately 45 feet. The tractor, which contained the motor and the driver's cab, had single wheels in front and dual wheels in the rear. The trailer had dual wheels in the rear but no wheels at the front, and was connected with the tractor by a coupling device in the center of the rear of the tractor upon which the front of the trailer rested. The coupler was so fashioned that the tractor could be turned "at right angles or more" to the trailer. The trailer resembled a "boxcar," being 8 feet wide, about 12 feet high, and 32 feet long. Its bottom was "3 or 4 feet" above the ground. The trailer itself weighed 7,500 pounds, and was being used to transport 15,000 pounds of cotton goods. The tractor-trailer combination was equipped with the head, rear, and clearance lamps required by G.S. 20-129. Furthermore, the left side of the trailer bore two reflectors. The trailer was dark in color, covered with sleet, and much spattered with mud.
The collision occurred a few feet north of the Tar Heel Service Station, which was located on the west side of the highway and which was open for business at the time. Witnesses estimated the distance between the station and the Tar River bridge to the south at anywhere from 165 to 230 yards. The tractor-trailer combination was actually stationary upon the highway at the precise instant of the collision, the tractor being headed north in the northbound traffic lane and the trailer being "jackknifed" westward at such an angle as to block the entire southbound traffic lane and extend onto the dirt shoulder to the west. The only witness at the trial professing any personal knowledge as to when, how or why the tractor-trailer combination came to a standstill on the paved *Page 126 
portion of the roadway was the defendant Dorman. The Plymouth coupe struck the left side of the stationary trailer while it was moving south along the southbound traffic lane at a speed of approximately 20 miles per hour.
There was sharp conflict in the evidence of the parties with respect to what lights Dorman was displaying at the time named in the pleadings. Witnesses for Thomas and Watson testified, in substance, that the only lights burning on the tractor-trailer combination were the headlights of the tractor, and that they pointed to the north along the northbound traffic lane. Dorman testified, however, that the head, rear, and clearance lights on the tractor-trailer combination were fully displayed.
Thomas and Watson presented evidence tending to show that right after the accident Dorman told police officers that the truck and trailer had been parked at the Tar Heel Service Station and that the collision happened in this manner: "Truck and trailer left service station on west side of the road, pulled into highway headed north, and choked down, completely blocking highway with exception of three feet. Car traveling south ran into left rear of trailer, damaging both vehicles and injuring both occupants of car."
Watson and Thomas were overtaken by the rain and sleet while en route from Roanoke Rapids to their homes in Rocky Mount. Watson testified, in substance, that he drove his Plymouth coupe in a southerly direction along the southbound traffic lane with the utmost caution on account of the state of the highway and weather; that his car proceeded at a speed of about 20 miles per hour, and he could have stopped it at any time within a space not exceeding 35 or 40 feet by applying his brakes, which were in excellent condition; that he observed the headlights of the Thurston Tractor before he crossed the Tar River bridge, and noted that they were projected northward along the northbound traffic lane; that such projection of the headlights combined with the darkness, rain, and sleet to prevent him from ascertaining whether the tractor was moving or standing still; that as he approached the tractor its headlights "stayed the same without blinking or change," and he assumed under the circumstances that it was a motor vehicle proceeding in the opposite direction which he was meeting and about to pass; that he drove his Plymouth coupe with the headlight beams tilted downward so as to see better in the darkness, rain, and sleet, and so as not to project a glaring light to motorists in his front; that his headlights so arranged enabled him to see to the front clearly for 150 feet despite the inclement weather, except when meeting a motor vehicle proceeding in the opposite direction; that as he approached the tractor he could see up to its headlights perfectly, but could not see anything beyond such headlights except blackness, which he "took to be night"; that "there were no lights of *Page 127 
any kind" or anything else in the southbound traffic lane to indicate the presence of the unlighted trailer in his pathway when he approached and passed the tractor and crashed against the left side of the trailer; and that he did not recall passing the headlights of the tractor because when he hit the trailer he "had a slight concussion and it knocked everything completely blank." Thomas gave evidence in accord with that of Watson and stated expressly that he "did not know there was going to be an accident until just about 10 feet before" it happened. Moreover, J. B. Williford, a police officer called to the stand by Watson, testified that "there was no way for a southbound car to have run around" the tractor and trailer on either side.
Thurston Motor Lines and Dorman presented evidence tending to show that both the motor in the tractor and the lighting system of the tractor-trailer combination were in perfect mechanical condition at the time in controversy. Dorman was the only eye-witness testifying in behalf of himself and his employer. He denied that the tractor and trailer had been parked at the Tar Heel Service Station prior to the collision. He testified further that he drove the tractor and trailer combination to his left half of the highway with a view to going onto the service station premises; that he stopped temporarily on such half of the highway and ascertained that he could not "get between the pumps and other vehicles that were sitting there"; that he thereupon put the tractor-trailer combination into motion and undertook "to get back across the road" to the northbound traffic lane to resume his northward journey; that his motor unaccountably stopped causing the tractor-trailer combination to stall on the highway after the tractor had crossed the center line and headed north, but before the trailer had cleared the southbound traffic lane; that at about the same time he became able to see the lights of the approaching Plymouth several hundred yards to the north; that the headlights of the tractor were pointing northward with the beams tilted downward, and he did not attempt to warn the operator of the Plymouth of his situation by blinking his headlights or otherwise because he deemed it wiser to try to start the tractor and pull the trailer onto the northbound traffic lane; and that in consequence he devoted all of his remaining efforts to an unsuccessful endeavor to start his motor until the Plymouth crashed into the left side of the stalled trailer. This statement was elicited from Dorman on his cross-examination: "I started back across the highway and saw the reflection of the lights. I first saw his actual headlights at the River Bridge. So at the time that I was pulling out of the service station to continue my journey north I knew that a car was coming from the north." Dorman confessed to an inability to assign any reason whatever for the stopping of the motor of the tractor. He conceded, however, *Page 128 
that the icy state of the highway did not cause the motor to stop or the tractor-trailer combination to stall.
The court submitted to the jury nine issues arising on the pleadings. These issues and the answers of the jury thereto were as follows:
1. Was plaintiff Thomas injured by the negligence of the defendants Thurston Motor Lines and L. C. Dorman, as alleged in his complaint? Answer: Yes.
2. What damage, if any, is the plaintiff Thomas entitled to recover of said Thurston Motor Lines and L. C. Dorman? Answer: $20,000.00.
3. Were the injuries of the plaintiff Thomas caused by the joint and concurrent negligence of the defendants Watson, Thurston Motor Lines and Dorman, as alleged? Answer: No.
4. Was Joseph W. Watson injured and damaged by the negligence of the defendants Thurston Motor Lines and Dorman, as alleged? Answer: Yes.
5. If so, did said Watson by his own negligence contribute to his injuries and damages, as alleged? Answer: No.
6. What damages, if any, is said Watson entitled to recover of Thurston Motor Lines and L. C. Dorman? Answer: $1,550.00.
7. Was the truck of Thurston Motor Lines damaged by the negligence of Joseph W. Watson, as alleged? Answer: No.
8. If so, did Thurston Motor Lines through its negligence contribute to such damage? Answer: _____.
9. What damages, if any, is Thurston Motor Lines entitled to recover of Joseph W. Watson? Answer: _____.
The court entered judgment for Thomas and Watson in conformity to the verdict, and Thurston Motor Lines and Dorman, appealed, assigning errors.
The appellants earnestly insist that the trial court erred in denying their motions to dismiss the action of Thomas and the counterclaim of Watson upon compulsory nonsuits under G.S. 1-183. They assert the action of Thomas should have been nonsuited for want of evidence of actionable negligence on the part of Dorman in the management of the tractor-trailer combination. They say their motions to dismiss the counterclaim of Watson ought to have been allowed either on the ground that there was no sufficient evidence of actionable negligence on the part of Dorman, or on the ground that Watson was contributorily *Page 129 
negligent as a matter of law. Furthermore, appellants have reserved exceptions to the refusal of the court to grant their prayers for instructions to the effect that there was no evidence of negligence on their part "in reference to the position of the truck on the highway at the time and place of the accident" and that Watson was guilty of contributory negligence as a matter of law.
We shall address ourselves initially to the inquiry of whether the court erred in refusing to nonsuit the action of Thomas. In passing upon this phase of the appeal, we must be guided by the accepted rule that the question of the liability of a defendant in an action for negligence can be taken from the jury and determined by the court as a matter of law by an involuntary nonsuit only in case the evidence is free from material conflict, and the only reasonable inference to be drawn therefrom is either that there was no negligence on the part of the defendant, or that the negligence of the defendant was not the proximate cause of the plaintiff's injury. Tysinger v. Dairy Products, 225 N.C. 717, 36 S.E.2d 246; Montgomery v. Blades, 222 N.C. 463, 23 S.E.2d 844; Mitchell v. Melts,220 N.C. 793, 18 S.E.2d 406; Luttrell v. Mineral Co., 220 N.C. 782,18 S.E.2d 412; Reeves v. Staley, 220 N.C. 573, 18 S.E.2d 239; Murray v. R.R., 218 N.C. 392, 11 S.E.2d 326; Templeton v. Kelley, 215 N.C. 577,2 S.E.2d 696; Ferguson v. Asheville, 213 N.C. 569, 197 S.E. 146; Smith v. Sink, 211 N.C. 725, 192 S.E. 108.
Both Thomas and Watson presented testimony on the trial tending to show that Dorman, who was admittedly acting within the scope of his authority as an agent of Thurston Motor Lines, operated the tractor-trailer combination upon the public highway on a dark, rainy, and sleety night without displaying thereon burning rear and clearance lights as required by G.S. 20-129, which was enacted by the General Assembly to minimize the hazards incident to the movement of motor vehicles upon the public roads during the nighttime. If Dorman did this, he was guilty of negligence per se. Page v. McLamb, 215 N.C. 789, 3 S.E.2d 275; Clarke v. Martin, 215 N.C. 405, 2 S.E.2d 10; Cook v. Horne, 198 N.C. 739,153 S.E. 315. This would be so irrespective of whether the tractor-trailer combination was disabled on the paved portion of the highway within the meaning of subsection c of G.S. 20-161 at the time of the collision.
There was also testimony tending to show that the tractor and trailer were parked on the premises of the Tar Heel Service Station on the west of the highway just before the collision; that Dorman put the tractor into motion and attempted to pull the inert trailer and its cargo, weighing 22,500 pounds in the aggregate, across the pathway of the oncoming Plymouth with a view to reaching the northbound traffic lane and resuming his northward journey; and that Dorman did this notwithstanding *Page 130 
The fact that he saw the Plymouth "coming from the north" at the very moment he drove the tractor-trailer combination "out of the service station." This testimony was ample to warrant the conclusion that Dorman was negligent at the time and place in controversy in that he proceeded onto the highway and into the path of the approaching Plymouth coupe with the tractor and trailer when he knew, or by the exercise of reasonable care would have known that he could not cross in front of the Plymouth in safety. Ingram v. Smoky Mountain Stages, Inc., 225 N.C. 444, 35 S.E.2d 337; Fowler v. Underwood, 193 N.C. 402,137 S.E. 155; 5 Am. Jur., Automobiles, section 306.
It has been noted that the only witness at the trial claiming any personal knowledge as to when, how or why the tractor-trailer combination came to a standstill on the paved portion of the highway was the defendant Dorman, who attributed the event solely to the unexplained stopping of the engine of the tractor. There was testimony on the trial indicating that the tractor-trailer combination was under the exclusive management of Dorman, the admitted agent of Thurston Motor Lines, when it stalled and obstructed the highway by reason of the unexplained stopping of the engine of the tractor; that such an engine does not stop in the ordinary course of things when according to its mechanical construction it ought to remain in operation except by reason of some defect in the machine or negligence in its operation; and that the engine and the other parts of this tractor-trailer combination were in perfect mechanical condition when the unexplained stopping of the engine took place. While they did not require any such conclusion, these circumstances were sufficient to permit an inference by the jury that the stopping of the engine and the resultant stalling of the tractor-trailer combination arose from a want of due care on the part of Dorman in the operation of the tractor. Boone v. Matheny, 224 N.C. 250, 29 S.E.2d 687; Etheridge v. Etheridge, 222 N.C. 616, 24 S.E.2d 477; Howard v. Texas Co., 205 N.C. 20,169 S.E. 832; Springs v. Doll, 197 N.C. 240, 148 S.E. 251; Ramsey v. Power Co., 195 N.C. 788, 143 S.E. 861; Ridge v. R.R., 167 N.C. 510,83 S.E. 762, L.R.A. 1917E, 215; Isley v. Bridge Co., 141 N.C. 220,53 S.E. 841; Liberatore v. Town of Framingham, 315 Mass. 538,53 N.E.2d 561; Glaser v. Schroeder, 269 Mass. 337, 168 N.E. 809; Doryk v. Perth Amboy Bottling Co., 104 N.J.L. 87, 139 A. 419; Blashfield's Cyclopedia of Automobile Law and Practice (Perm. Ed.), 6043; 45 C.J., Negligence, section 768; 38 Am. Jur., Negligence, section 295.
Furthermore, it cannot be said as a matter of law that Dorman acted as an ordinarily prudent person would have acted under the same or similar circumstances after the tractor and trailer came to a standstill on the paved portion of the highway. There was testimony indicating that the lighting system of the tractor-trailer combination was in perfect *Page 131 
mechanical condition, but that the rear and clearance lights were not burning. The jury might well have inferred that due care under the existing circumstances would have prompted Dorman to turn on the rear and clearance lights as a warning to approaching motorists of the impending peril, and that he failed to do so. Pender v. Trucking Co.,206 N.C. 266, 173 S.E. 336.
Whether Dorman was negligent in any of these respects, and whether such negligence constituted the proximate cause or one of the proximate causes of personal injury to Thomas were fact questions. Conley v. Pearce-Young-Angel Co., 224 N.C. 211, 29 S.E.2d 740; Quinn v. R.R.,213 N.C. 48, 195 S.E. 85; Yates v. Chair Co., 211 N.C. 200,189 S.E. 500; Thurston v. R.R., 199 N.C. 496,154 S.E. 836. This is true even with respect to the testimony indicating a failure on the part of Dorman to display burning rear and clearance lights conforming to G.S. 20-129. The trailer was "jack-knifed" across the highway at "almost a 45 degree angle" with its left side in the pathway of the southbound Plymouth, and it cannot be asserted with dogmatism that there was no causal relation between the alleged unlighted rear and clearance lights and the collision. It follows that the court properly submitted to the jury the question of whether Thomas suffered personal injury as the proximate consequence of negligence on the part of Dorman. Barrier v. Thomas and Howard Co., 205 N.C. 425, 171 S.E. 626. This conclusion would not be altered if Watson had been guilty of concurrent negligence constituting one of the proximate causes of the injury sustained by Thomas. Such negligence on the part of Watson would not be imputed to Thomas, an invited guest having no interest in the Plymouth and no control over its driver. Sample v. Spencer, 222 N.C. 580,24 S.E.2d 241; Dillon v. Winston-Salem, 221 N.C. 512,20 S.E.2d 845; Harper v. R.R., 211 N.C. 398,190 S.E. 750; Gaffney v. Phelps, 207 N.C. 553, 178 S.E. 231; Keller v. R.R., 205 N.C. 269, 171 S.E. 73.
What has been said compels the adjudication that the court did not err in refusing to charge that there was no evidence of negligence on the part of Dorman and the Thurston Motor Lines "in reference to the position of the truck on the highway at the time and place of the accident," or in denying the motion to nonsuit the counterclaim of Watson upon the specific ground that there was no sufficient evidence of actionable negligence on the part of Dorman.
This brings us to a consideration of the question of whether the trial court ought to have nonsuited the counterclaim of Watson or directed a verdict thereon for appellants upon the ground that Watson, who occupied the status of a plaintiff in respect to his counterclaim, was contributorily negligent as a matter of law. Appellants invoke the long line of cases beginning with Weston v. R.R., 194 N.C. 210, 139 S.E. 237, and *Page 132 
ending with Bus Co. v. Products Co., 229 N.C. 352, 49 S.E.2d 623, declaring either expressly or impliedly that "it is negligence as a matter of law to drive an automobile along a public highway in the dark at such a speed that it cannot be stopped within the distance that objects can be seen ahead of it." The appellants assert on the basis of these decisions that the testimony as a whole compels the single conclusion that Watson proximately contributed to his own misfortune by outrunning his headlights.
Few tasks in trial law are more troublesome than that of applying the rule suggested by the foregoing quotation to the facts in particular cases. The difficulty is much enhanced by a tendency of the bench and bar to regard it as a rule of thumb rather than as an effort to express in convenient formula for ready application to a recurring factual situation the basic principle that a person must exercise ordinary care to avoid injury when he undertakes to drive a motor vehicle upon a public highway at night. The rule was phrased to enforce the concept of the law that an injured person ought not to be permitted to shift from himself to another a loss resulting in part at least from his own refusal or failure to see that which is obvious. But it was not designed to require infallibility of the nocturnal motorist, or to preclude him from recovery of compensation for an injury occasioned by collision with an unlighted obstruction whose presence on the highway is not disclosed by his own headlights or by any other available lights. When all is said, each case must be decided according to its own peculiar state of facts. This is true because the true and ultimate test is this: What would a reasonably prudent person have done under the circumstances as they presented themselves to the plaintiff? Blashfield's Cyclopedia of Automobile Law and Practice, sections 741, 751.
In ruling on a motion for nonsuit, the court takes it for granted that the evidence favorable to the plaintiff is true and resolves all conflict of testimony in his favor. Bundy v. Powell, 229 N.C. 707, 51 S.E.2d 307. When this is done in this litigation, it becomes plain that there was evidence on the trial sufficient to establish the matter stated in the next succeeding paragraph.
Watson unexpectedly encountered the rain and sleet en route home. He was not bound as a matter of law to stop and wait for the storm to subside or for daylight to come in order to escape the imputation of contributory negligence. Indeed, he might reasonably have inferred that even a temporary stopping of the Plymouth and the resultant partial blocking of the icy roadway would magnify rather than minimize existing perils. He elected to proceed homeward. In so doing, he acted with the utmost caution on account of the inclement state of the weather and road. He traveled exclusively upon his right-hand half of the highway *Page 133 
at a speed of only 20 miles per hour. As he approached the place of collision, Watson saw the headlights of the tractor shining along the northbound traffic lane in such a manner as to indicate that the tractor was moving northward on its own side of the road, and drew an inference from this fact and the other attending circumstances that he was meeting and about to pass another motor vehicle proceeding in the opposite direction along his left-hand half of the highway. Indeed, Watson's conclusion that the tractor was in motion may well have been in complete accord with actuality up to a split second before the collision for Dorman admitted that he saw the lights of the oncoming Plymouth as he "pulled out of the service station" to continue his journey to the north. As he had no notice of any kind to the contrary, Watson had a right to act on the assumption that Dorman would not operate a tractor-trailer combination on the highway at night without displaying thereon all the lights required by law. Since the descending rain and sleet impaired his vision, Watson drove with his headlights tilted downward in order to better his capacity to see and to avoid projecting a glaring light into the faces of the motorists he was meeting. As he neared the place of the accident, Watson could observe everything perfectly up to the headlights of the tractor, but he could not see anything beyond such headlights "except blackness which he took to be night." His inference that nothing except "night" lurked in his path beyond the headlights of the tractor was reasonable because the dark colored and unlighted trailer was spattered with mud, and covered with sleet, and blended with the surrounding darkness, rain, and sleet. These circumstances in combination with the falling rain and sleet and the 3 or 4 feet of space between the surface of the road and the bottom of the unlighted trailer prevented the headlights of the Plymouth from "picking-up" the trailer and disclosing its presence on the highway to Watson until the collision had become inevitable.
Manifestly, this testimony was sufficient to warrant a finding by the jury that Watson acted as a reasonably prudent person would have done under the circumstances as they presented themselves to him at the time and place of the accident. In consequence, the court properly denied the motions of the appellants to nonsuit his counterclaim on the theory that he was contributorily negligent as a matter of law. Barlow v. Bus Lines, 229 N.C. 382, 49 S.E.2d 793; Cummins v. Fruit Co., 225 N.C. 625,36 S.E.2d 11; Cole v. Koonce. 214 N.C. 188, 198 S.E. 637; Williams v. Express Lines, 198 N.C. 193, 151 S.E. 197.
This conclusion compels the further ruling that the court rightly refused to give the jury the instruction requested by appellants to the effect that they would be entitled to contribution from Watson as a matter of law in case of any recovery against them by Thomas. *Page 134 
We have carefully considered the exceptions of appellants to the charge, and have concluded that none of them can be sustained.
The trial and judgment will be upheld for we find in law
No error.