## Stadham Company *v.* Century Indemnity Company, Appellant.

Argued March 28, 1950. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Thomas F. Mount,* with him *Robert E. Jones, Joseph W. Henderson* and *Rawle & Henderson,* for appellant.

*Thomas I. Guerin,* with him *Isidore Penn,* for appellee.

OPINION BY ROSS, J., July 20, 1950:

This is an action of assumpsit brought by the Stadham Company, a corporation, upon an employes' fidelity bond—called a "Blanket Position Bond"—issued to it by the defendant. The jury rendered a verdict for the plaintiff in the sum of $1366.40 (representing the amount of the alleged loss with interest from the date of demand), whereupon the defendant filed motions for judgment n. o. v. and for a new trial, both of which were refused, judgment entered on the verdict and this appeal followed.

Reading the evidence in the light most favorable to the plaintiff and giving it the benefit of all inferences reasonably deducible therefrom, as we are required to do in view of the verdict of the jury, the facts are as follows:

During the period in which the bond in suit was in force, the plantiff was engaged in the business of selling supplies to the laundry and dry cleaning trade. Its warehouse consisted of two adjoining buildings in which approximately one thousand items were kept in stock. These buildings were protected by a system of burglar alarms, and when no employees were about, the rooms in which the stock was kept were locked. It was the practice of the plantiff to make physical inventories of its stock semi-annually on April 30 and October 31. The physical counts of each item of stock were at these times compared with corresponding inventory cards which were kept current by adding incoming shipments as debits and subtracting sales as credits. These inventory cards were kept with care and accuracy. A physical inventory made in the normal course of business April 30, 1947 disclosed no shortages in stock.

In October of 1947, the plaintiff received an order for a number of laundry nets, an item regularly stocked by it for the purpose of resale, and discovered that,

although the inventory card showed an ample supply on hand to fill the order, the number of nets actually in stock as determined by a physical count was insufficient for the purpose. On Saturday morning, October 18, 1947, James Taylor, driver of the only truck used by the plaintiff in its business, arrived at the warehouse while the warehouse manager and other employes were away and prepared to drive the truck from the warehouse. Michael W. Steinig, president of the plaintiff, asked Taylor what he intended to do with the truck and Taylor represented that James L. Steinig, vice president of the plaintiff, had told him to take the truck out for the purpose of having it greased and the battery checked, which was an untrue statement.

The discovery of the shortage in the supply of laundry nets, coupled with the unauthorized use of the company truck by Taylor on a day when he was not supposed to be at work, aroused the suspicions of the plaintiff's officers and caused them, on Tuesday, October 21, 1947, to have made spot checks of stock on hand as compared with inventory records. This spot check disclosed a shortage of approximately $1200.00. On that same day Taylor was called into the office of. Michael W. Steinig and told by Steinig that he was suspected of having caused the shortage. Taylor did not deny the theft but rather said, "How much is it? I will pay if you don't do anything about it." And, when informed of the amount of the shortage, said, "Oh, it can't be that much." It was in evidence that Taylor had, on October 17, 1947, asked James Belton, another of plaintiff's employes, if he wanted to make some easy money selling laundry nets belonging to the plaintiff.

Taylor did no further work for the plaintiff after October 21, 1947, returning only to collect his pay on Friday, October 24, 1947. A regular semi-annual inventory was taken by the plaintiff on October 31, 1947,

and it disclosed a shortage of $1248.61, for which sum the present action was brought.

In support of its motion for judgment n. o. v., the defendant contends that the evidence does not support the verdict in that the plaintiff did not meet the burden of proving a loss imposed upon it by the bond, the pertinent provision of which is as follows:

"3. That in case a loss is alleged to have been caused by the fraud or dishonesty of one or more of the Employes and the Insured shall be unable to designate the specific Employe or Employes causing such loss, the Insured shall nevertheless have the benefit of this bond, provided that the evidence submitted reasonably establishes that such loss was in fact due to the fraud or dishonesty of one or more of said Employes, but if such loss, or any part thereof, be disclosed by an inventory computation, the Insured shall have the benefit of this bond only for so much of the loss so disclosed as the evidence submitted conclusively establishes was in fact due to the fraud or dishonesty of one or more of said Employes . . ."

It will be seen that the latter portion of the above provision has no application unless the loss is *discovered* (for it is in this sense that the word "disclosed" must be read) as the result of an inventory computation. If the loss is discovered by any means other than an inventory calculation, the first part of paragraph 3 governs and the insured need only submit evidence which "reasonably establishes" that such loss was in fact due to the fraud or dishonesty of one or more of its employes. This construction is strengthened by the Indemnity Clause of the bond by which the defendant agreed to indemnify the plaintiff "against any loss of money or other property, real or personal (including that part of any inventory shortage which the Insured shall conclusively prove has been caused by the dis-

honesty of any Employe or Employes) belonging to the Insured, . . ."

It is clear in the present case that the plaintiff was aware of the *fact* that there had been a loss in advance of either the spot check or the inventory taken to determine the *extent* of such loss; and it cannot be said as a matter of law that the plaintiff failed to present evidence which "reasonably established" that it suffered a loss due to the fraud or dishonesty of its employe.

Even assuming that the alleged loss was discovered as the result of an inventory computation and that, therefore, the plaintiff was required to present evidence which "conclusively" established that the loss was in fact due to the fraud or dishonesty of one or more of its employes, the result would not be different. The phrase "conclusive evidence", when used in an insurance policy, is not to be given its technical meaning: it merely serves to cast upon the insured the burden of introducing evidence which excludes any other theory than that the loss was occasioned by the risk insured against: *Perry v. Southern Surety Co.,* 78 Pa. Superior Ct. 222. This burden the plaintiff has met and overcome. The possibility of the loss having been caused by the thefts of persons other than the plaintiff's employes is excluded within practicable limits by evidence showing that the warehouses were protected by a system of burglar alarms and that the storerooms in which the stock was kept were locked at all times when none of the plaintiff's employes were about. Furthermore, the evidence in regard to the guilt of the plaintiff's employe, James Taylor, tends to further weaken the hypothesis of thefts by outsiders. In this connection, the defendant mentions the fact that commercial truckers had access to the plaintiff's warehouse and suggests that one or more of them might have been responsible for the losses. The answer to

this contention is to be found in the evidence presented by the defendant itself for the purpose of showing the improbability of James Taylor having committed the thefts. This testimony illustrates the care with which the plaintiff's warehouse manager checked outgoing shipments carried by Taylor. There is no reason to suppose that the warehouse manager would be less careful in checking shipments handled by these commercial truckers. The presumption is to the contrary.

The possibility that the loss was only a paper loss resulting from an error on the inventory is excluded by evidence showing a record of eighteen years of accuracy in the taking of such inventories. There is no suggestion of a price change which, if not compensated for on the inventory cards, would result in an apparent shortage, and further the plaintiff kept an itemized list of its stock which disclosed that specific items were missing. The shortage could not be accounted for by sales made on credit since such sales were deducted from the running balance on the inventory cards in the same manner as cash sales.

The defendant's motion for judgment n. o. v. was properly refused.

In support of its motion for a new trial, the defendant argues that the trial court committed prejudicial error by admitting into evidence the inventory taken by the plaintiff on October 31, 1947, because it was taken ten days after James Taylor left the employ of the plaintiff and for that reason might reflect losses resulting from causes other than the larceny of James Taylor.

We think that this particular point has been decided adversely to the defendant in *Hamill v. Fidelity & Casualty Co. of N. Y.*, 104 Pa. Superior Ct. 602. In that case, the bulk of the loss for which the insured brought suit under a policy providing indemnity for

"loss by burglary, theft or larceny . . . committed by a guest or by a domestic servant or other employe of the assured or by any person whose property is not covered hereby . . ." resulted from the loss of certain rings alleged to have been stolen by servants of the insured. On the trial, the plaintiff sought to recover for the rings and in addition certain other property, the loss of which was not discovered until some time after the servants alleged to have caused the loss of the rings had been discharged. This Court held that the jury might properly consider the other property as a part of the plaintiff's loss. Implicit in the holding on this particular point is the idea that the time intervening between the discharge of the servants and the discovery of the loss of the other property is so short as to make any inference than that the loss was occasioned by the discharged servants unreasonable. The principle is applicable to the circumstances in the present case and disposes of this contention of the defendant.

The defendant further complains of the inadequacy of the trial court's charge, to which it took neither specific nor general exception. In these circumstances, mere inadequacy of a charge may not be made the basis for the reversal of a lower court's refusal to grant a new trial. *Phila. Saving Fund Society v. Bethlehem,* 143 Pa. Superior Ct. 449, 17 A. 2d 750; *Roberts & Moritz v. Fickler,* 76 Pa. Superior Ct. 237; *Seret v. Carbley,* 350 Pa. 434, 39 A. 2d 607. A party may not remain silent and take his chances on a verdict, and then, if it is adverse, complain of mere inadequacy which could have been corrected. *Meholiff v. River Transit Co.,* 342 Pa. 394, 20 A. 2d 762; *Susser v. Wiley,* 350 Pa. 427, 39 A. 2d 616.

The refusal of a new trial will be reversed only upon a showing that the court manifestly abused its discretion (*Holt v. Pariser,* 161 Pa. Superior Ct. 315,

276

54 A. 2d 89) and in this case we find no such abuse of discretion.

Judgment affirmed.