NATIONAL SHIRT AND HAT SHOPS OF THE CAROLINAS, INC., v. AMERICAN MOTORISTS INSURANCE COMPANY AND WILLIAM W. WADE.

(Filed 1 February, 1952.)

**1. Trial § 22a—**

On motion to nonsuit, the evidence must be considered in the light most favorable to plaintiff.

**2. Indemnity § 2d—Evidence held for jury on question of whether loss was due to wrongful act of employee within coverage of indemnity contract.**

The evidence favorable to plaintiff insured tended to show not only an inventory shortage on the part of its store manager, but also that the manager admitted his responsibility for the shortage, that he had failed to follow instructions that he keep the cash register tickets constituting the only record evidence which would conclusively show whether he had properly accounted for merchandise sold, that he requested one of his clerks to overcharge customers, that his asserted prior report of inventory shortage had not been received by insured, and that he kept reporting

inventories which he knew he did not have on hand.  *Held:* Although contradicted in material respects by the testimony of the manager, the evidence shows more than a mere possibility or opportunity on the part of the manager to misappropriate the property or a mere equal opportunity for others to have abstracted the goods, and is sufficient to be submitted to the jury in an action on a contract indemnifying the insured against loss arising from misappropriation or wrongful act of the manager.

**3. Same: Evidence § 7a—**

The general rule that plaintiff in a civil action, even though the issue include a criminal charge, has the burden of proving his case by the preponderance or the greater weight of the evidence *held* not altered or modified by the language of the indemnity contract sued on obligating insurer to make good inventory shortage which "insured shall conclusively prove to have been caused by the dishonesty of any employee."

**4. Trial § 23e—**

In a civil action it is not required that circumstantial evidence preclude any other reasonable hypothesis in order to be sufficient to be submitted to the jury upon the issue, but only that it be sufficient reasonably to establish the facts in issue.

APPEAL by defendants from *Sharp, Special Judge,* February Term, 1951, of GUILFORD (Greensboro Division).

This is a civil action instituted originally against the American Motorists Insurance Company, which is hereinafter called Insurance Company, to recover under a blanket position bond executed and delivered by the original defendant to the plaintiff.  The plaintiff alleges that it sustained a loss of $1,041.35 arising from embezzlement by the manager of its Charlotte store, William W. Wade, hereinafter called Wade, during the time the bond was in force.  Wade was made a party defendant on motion of the defendant Insurance Company so that in the event a judgment was obtained by the plaintiff against the Insurance Company, it could recover judgment over against Wade, who would, in that event, be primarily liable for any recovery by the plaintiff.

It was conceded in the trial below that the bond was in force while Wade was an employee of the plaintiff and that the plaintiff complied with the provisions of the bond as to notice and proof of loss.  And the defendant Wade does not contest the right of the Insurance Company to have judgment over against him for any amount the plaintiff is entitled to recover from it.  However, both Wade and the Insurance Company contend that the plaintiff suffered no loss for which it is entitled to be indemnified under the terms of the bond in suit.

The plaintiff owns and operates six retail stores in North Carolina, South Carolina, and Virginia, engaging in the sale of men's clothing, principally shirts, hats, jackets, ties, and related items and accessories. For several months prior to 8 August, 1946, the defendant Wade was

employed by the plaintiff as a sales clerk in its Greensboro store. On the above date, he was promoted to the position of manager of the plaintiff's Charlotte store and given authority to employ and discharge the personnel employed in the store. Physical inventories of the merchandise in this store were taken under the supervision of the plaintiff's district manager, Thomas H. Asbury, on 8 August, 1946, 17 January, 1947, 9 March, 1947, and 13 January, 1948. The inventory on 13 January, 1948, disclosed a merchandise shortage of $1,041.35 at retail prices. The shortage reflected by this inventory amounted to 327 items with a total retail sales price of $1,377.25, less an overage of 82 items in the amount of $335.90, leaving a net shortage of $1,041.35.

The indemnifying clause of the bond in suit provides that the defendant insurer will indemnify the plaintiff "against any loss of money or other property, real or personal, (including that part of any inventory shortage which the Insured shall conclusively prove has been caused by the dishonesty of any Employee or Employees) belonging to the Insured, or in which the Insured has a pecuniary interest, . . . which the insured shall sustain, . . . through larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction, willful misapplication, or other fraudulent or dishonest act or acts committed by one or more of the employees . . . acting directly or in collusion with others, . . ."

According to the evidence offered by the plaintiff, all merchandise in its Charlotte store, as well as in its other retail stores, is marked at retail price when shipped to the store and the manager of the store enters such merchandise in his inventory. A special inventory sheet is used on which the total number of the various items selling at a fixed price are entered. For example, the number of shirts to be sold at $2.95 would be listed in one column, the shirts to be sold at $3.95 would be listed in another, and the hats to be sold at $5.95 would be listed in still another column. By this method the company carried what is called a perpetual inventory. As merchandise was sold, such sale was to be rung up on the cash register, and the register would throw out a sales ticket. Every ticket thrown out of the cash register would have a number on it, the date, and the amount of the sale. The cash register numbered the sales tickets consecutively. It was the duty of the respective clerks in the store to write on each ticket, the article or articles sold. The sales force in the Charlotte store, except occasionally on busy days, usually consisted of the manager and two clerks. It was the duty of the manager of the store to take the cash register tickets each day and check them against the cash, and to ascertain the different items of merchandise sold during the day. It was also his duty to subtract the items sold from the inventory and to add to the inventory any new merchandise received that day. The manager of the store, the defendant Wade, was instructed to deposit his cash receipts in

the bank each day and to mail a copy of the deposit slip to the principal office of the company in Greensboro. He was likewise instructed to send in a copy of his inventory each week, which he did, and to take a physical inventory each two weeks which he never did at any time except when he assisted Mr. Asbury to take such inventories at the times referred to above. He was instructed, according to the plaintiff's evidence, to keep the cash register tickets so that any discrepancies in the inventory might be checked against the actual sales. Mr. Chandgie, president of the corporation, testified, "all those tickets are consecutively numbered. If we had those tickets we could determine if he had deposited all the cash he has received. Wade was given instructions to retain those tickets. He was instructed to retain them so that at any time it was found necessary to check up, we could check with those tickets and with the reports and also with the deposits in the bank. He did not have those tickets when the check was made."

Also, according to the plaintiff's evidence, when the physical inventories were made by Mr. Asbury on 17 January, 1947, and 9 March, 1947, while there were a number of shortages and overages, the inventories were correct, with normal differences; therefore, according to the testimony of Mr. Asbury, there was no occasion to check the cash register tickets against the inventories. But when the physical inventory was again taken by him on 13 January, 1948, and the shortage in the inventory was discovered, upon inquiry as to the cash register tickets so that a check could be made on the defendant Wade's daily reports, Wade said he had torn them up and thrown them away. He only had in his possession the cash register tickets for the day on which the inventory was taken. He admitted he was responsible for the shortage, but said he could not explain how it occurred.

One of the clerks, Charm Smith, who was employed by Wade, testified that about two months prior to the time the inventory shortage was discovered, Mr. Wade requested him to overcharge customers, but he refused to do so. This witness also testified he was present when Mr. Wade and Mr. Asbury took the inventory in January, 1948, and heard Wade "make about the same statement to Mr. Asbury in reference to the shortage as he told Mr. Chandgie. He said that he would try to pay it back as soon as he could."

It further appears from the evidence that within the period from 17 January, 1947, to 9 March, 1947, less than sixty days, there were 111 transactions which were in error. There was an overage in this period of $188.15 and a shortage of $180.30, or a net overage of $7.85. It is pointed out in the evidence that such discrepancies normally occur in failing to list accurately the items sold. A shirt might be listed, for instance, when actually a jacket was sold. The number of jackets in that

event would be short one, and the shirts selling at the same retail price, would be over, etc. These overages and shortages usually balanced each other out with small differences, and the difference would be adjusted in the inventory.

When Mr. Wade took charge of the Charlotte store of the plaintiff, the locks were changed and the keys delivered to him. He used his own discretion as to what clerk or clerks he permitted to have a key to the store. One of the clerks was given a key for his use while Mr. Wade was manager.

The defendant Wade testified in his own behalf and denied that he was ever instructed to save the cash register tickets so they could be checked against the physical inventories taken by Mr. Asbury, or that he was instructed to take a physical inventory each two weeks. He testified that Mr. Asbury gave him instructions to keep the cash register tickets only from one report to the next. He denied having ever taken any cash or merchandise from the store other than that to which he was entitled. He denied having requested his clerk, Charm Smith, to overcharge customers, but on the contrary said he had discharged one clerk for overcharging. He further testified, "All this shortage could have been the result of shoplifting. It could all have gotten out without even catching the men. Yes, I think that you could be short 350 items right under your nose in that store from shoplifting over a period of time. . . . It was nine months from the time the inventory was taken, and I did not say there were 350 items shoplifted from that store. I know plenty of times of shoplifting. I know of every time merchandise was recovered, yes. I couldn't prove if any of the clerks or anyone in the store took any merchandise."

It appears from the defendant Wade's evidence that the value of the stock of merchandise varied while he was manager of the plaintiff's store. It was approximately $30,000 during the fall of the year, and at other times it was about $18,000 or $19,000.

The defendant Wade also testified that about two or four months before the physical inventory was taken, showing a shortage of $1,041.35, he wrote Mr. Asbury that he "was short at the time one hundred and some $4.45 shirts," he thought it was about 150, and asked Mr. Asbury to check back and find out how he got that shortage in his inventory. "I was over in some other price. . . . I do not have a copy of that letter. I did not know that that letter would be important today. Why should I think it would be? It is true that I kept reporting inventories which I did not have on hand and which I knew I did not have on hand. My reports were not correct and I knew they were not correct. So did Greensboro."

The witness, in answer to a question about spot inventories and what it meant, explained it in this manner: "I could count two or three items . . . in the trade that is what is known as spot inventory . . . Occasionally I counted it . . . It is true that any spot inventories I took showed that I did not have on hand the amount of merchandise I had received. I don't know when. I reported it only once. That was in August. . . . I did not ever tell Mr. Asbury I realized it was my responsibility and I would pay for it." At this point the witness was handed a letter in his own handwriting, dated February 25, 1948, which he had sent to Mr. Chandgie, in which he stated: "I have never taken one cent out of the store other than what was paid me as salary . . . I realize this is my responsibility, I am offering no alibis, I have failed in my duty. I intend to make your loss good, but I can only do it over a period of time, as I earn money."

According to Mr. Wade's testimony, his earnings were from $4,200 to $4,300 a year while he was manager of the plaintiff's store. He was married 15 March, 1947, and has two children, one of them a stepchild. Since his marriage he had withdrawn and spent his savings of several hundred dollars. He had found it necessary to sell his automobile and "to borrow money from time to time to keep running on. When I went there I had saved several hundred dollars and left there penniless."

The plaintiff, in rebuttal, recalled Mr. Asbury, who testified he never instructed Mr. Wade to throw away the cash register tickets. "I instructed Mr. Wade, as I instructed all managers, to hold on to those tickets as they are a definite record of the amount of business he has done." The witness further testified he did not recall ever having received any letter from Mr. Wade with respect to any shortage in his inventory. And neither the plaintiff nor defendant offered any evidence of any request for an adjustment of inventory resulting from shoplifting. Small differences had been allowed from time to time, when physical inventories were taken, for shrinkage supposed to be due to shoftlifting. However, most of the inventories were over.

The issues submitted to the jury and the answers thereto, are as follows:

"1. Did William W. Wade embezzle money or other property of the plaintiff, as alleged? Answer: YES.

"2. If so, what amount of money or other property belonging to the plaintiff did said William W. Wade embezzle? Answer: $1,041.35."

Accordingly, judgment was entered in favor of the plaintiff and against the Insurance Company, for $1,041.35 and costs, and a further judgment was entered in favor of the Insurance Company against the defendant Wade, for $1,041.35 and costs.

The defendants appeal, assigning error.

*Welch Jordan for defendant appellant, American Motorists Insurance Company.*

*Shuping & Shuping for defendant appellant, William W. Wade.*

*Falk, Carruthers & Roth for plaintiffs, appellees.*

DENNY, J.   The defendants challenge the correctness of the ruling of the court below in denying their motions for judgment as of nonsuit interposed at the close of the plaintiff's evidence and renewed at the close of all the evidence.

We think the evidence introduced in the trial below, when considered in the light most favorable to the plaintiff, as it must be on a motion for judgment as of nonsuit, is sufficient to warrant the submission of the case to the jury. *Chambers v. Allen,* 233 N.C. 195, 63 S.E. 2d 212; *Winfield v. Smith,* 230 N.C. 392, 53 S.E. 2d 251; *Thomas v. Motor Lines,* 230 N.C. 122, 52 S.E. 2d 377; *Bundy v. Powell,* 229 N.C. 707, 51 S.E. 2d 307.

We concede that the loss disclosed by the shortage in plaintiff's inventory at its Charlotte store, without any further evidence tending to show that such loss was the result of larceny, theft, embezzlement, forgery, misapplication, wrongful abstraction, wrongful misapplication, or other fraudulent or dishonest act or acts, committed by one or more of the employees of the plaintiff, during the period covered by the bond in suit, would be insufficient to support a verdict against the defendant Insurance Company. *Bank v. Fairley,* 202 N.C. 136, 162 S.E. 229; 98 A.L.R. 1271n; *Home Owned Stores v. Standard Acc. Ins. Co.,* 256 Ky. 482, 76 S.W. 2d 273; *Crescent Cigar & Tobacco Co. v. National Casualty Co.* (La. 1934), 155 So. 505; *Phipps v. American Employers' Ins. Co. of Boston, Mass.,* 118 Pa. Super. 133, 179 A. 816; *Salley v. Globe Indemnity Co.,* 133 S.C. 342, 131 S.E. 616; *Hartford Acc. & Indemnity Co. v. Hattiesburg Hdw. Stores* (Miss. 1951), 49 So. 2d 813; *Cobb v. American Bonding Co. of Baltimore* (5th C.C.A.), 118 F. 2d 643.

While the defendant Wade denied the commission of any dishonest acts in connection with the alleged shortage, he did not deny the correctness of the amount of the shortage as reflected by the inventory but simply claimed he could not explain how it occurred.   However, according to the evidence, he admitted he was responsible for the shortage and wrote the president of the plaintiff corporation that he realized the shortage was his responsibility; that he was offering no alibis; that he had failed in his duty and intended to make the loss good.

This admission of responsibility for the shortage does not constitute an admission of guilt, but it does tend to show that he did not believe, nor contend, that the shortage occurred as a result of shoplifting or by any other method over which he had no control and for which he was not responsible.   Moreover, it appears from the evidence that he destroyed

the cash register tickets which constituted the only record evidence that would have shown conclusively whether or not he properly accounted for all the merchandise sold in the plaintiff's Charlotte store while he was manager. He denies having ever been instructed to preserve the cash register tickets. However, there is ample evidence to support a finding to the contrary. There is also evidence to the effect that he requested one of his clerks to overcharge customers. This would tend to show that some reason existed which made it necessary or desirable to obtain surplus cash. Furthermore, according to Wade's testimony, he reported one shortage in inventory to the Greensboro office of the company and requested Mr. Asbury to check on it. No such report was received or any such request made, according to Mr. Asbury's testimony. Moreover, the defendant Wade testified he made reports to the company in Greensboro which were not correct and he knew they were not correct. "It is true that I kept reporting inventories which I did not have on hand and which I knew I did not have on hand." He undertakes, however, to absolve himself of blame in this respect by saying, "So did Greensboro."

When the above evidence is taken into consideration, we think it is sufficient to support the verdict rendered below and to distinguish this case from those relied upon by the defendants. The evidence goes beyond showing possibility of misappropriation on the part of the defendant Wade (*Broughton v. Oil Co.,* 201 N.C. 282, 159 S.E. 321), or mere opportunity to commit the offense alleged (*State v. Gordon,* 225 N.C. 757, 36 S.E. 2d 143), or equal opportunity for others to have abstracted the goods or money (*S. v. Penry,* 220 N.C. 248, 17 S.E. 2d 4), as contended by the defendants.

It is further contended by the defendants that the charge on the burden of proof on the first issue was erroneous, which was as follows: "The burden of proof upon this first issue is upon the plaintiff to satisfy you by the greater weight of the evidence that William W. Wade embezzled money or other property of the plaintiff as alleged in the complaint."

It is contended that since the bond in suit provides indemnity "against any loss of money or other property, real or personal (including that part of any inventory shortage which the Insured shall conclusively prove has been caused by the dishonesty of any Employee or Employees) belonging to the Insured . . . through embezzlement . . .," etc., the court is required to charge the jury as to its duty in "measuring the burden of the issue" in the light of this language. However, it is not contended that the purpose of the bond with respect to the conclusiveness of proof as to an inventory shortage was designed for or could have the effect of altering, modifying, or enlarging the rules of evidence.

We think the contention is without merit. It is settled with us that in a civil action containing an issue including a criminal charge, the party

required to carry the burden of proof is only required to do so by a pre-ponderance of the evidence or by its greater weight. *Rippey v. Miller,* 46 N.C. 479; *Blackburn v. Insurance Co.,* 116 N.C. 821, 21 S.E. 922; *Hyder v. Hyder,* 215 N.C. 239, 1 S.E. 2d 540. See also *Stadham Co. v. Century Indemnity Co.,* 167 Pa. Super, 268, 74 A. 2d 511.

In the case of *Miller v. Massachusetts Bonding & Ins. Co.,* 247 Pa. 182, 93 A. 320, the Court construed a provision in an indemnity bond which required any loss thereunder to be proven by "direct and affirmative evidence," and in which action the defendant contended that by reason of this provision, loss could not be established by circumstantial evidence. The Court said: "Appellant's contention is that the evidence adduced by plaintiff to show the felonious taking of the property was wholly circumstantial, and that, conceding the sufficiency of the evidence in ordinary case to warrant an inference of theft, yet, because here the agreement of the parties required for the establishment of this material fact on which defendant's liability was made dependent evidence direct and affirmative, of the former of which there was none, binding instructions should have been given. This contention gives to the words 'direct and affirmative evidence,' a meaning so severely technical that, if this meaning alone can be given them, a policy containing the provision we have here would avail the assured only in the rarest and most exceptional cases, so exceptional that the average person would hardly think the contingency in which the policy could operate worth guarding against. . . . To limit the assured's right to recovery to cases where the *corpus delicti* can be proved by direct testimony—that is, by the testimony of witnesses who saw the actual taking—would make the policy next to valueless. We will not impute to the defendant company any such purpose in the use of these words; nor can we assume that the assured understood them in this narrow and restricted sense. . . . Stated plainly, what is contended for is that, the *factum probandum* being the felonious taking of the property, this could only be established by the testimony of one or more witnesses who were present and saw the theft or larceny actually committed; or it may be stated thus, that the parties intended by the words to exact a higher degree of proof to charge the company with liability for the loss than the law requires to convict the burglar or thief of the crime itself. . . . A reasonable construction of the words would ascribe to the parties the single purpose to require something more than the mere fact of loss to entitle the assured to recovery on the policy."

In construing a provision similar to that considered in the last cited case, the Court in the case of *Gaytime Frock Co. v. Liberty Mut. Ins. Co.* (7th C.C.A.), 148 F. 2d 694, said: "Concededly, to establish defendant's liability, it was necessary that plaintiff prove that the inventory shortages were caused by fraud or dishonesty of plaintiff's employees. . . . It was

not necessary that the plaintiff's proof should establish facts sufficient to convict the employee or employees of larceny, . . . To be sure, the fact that the shortages were caused by the dishonesty of plaintiff's employee or employees may be established by circumstantial evidence, but the evidence to establish that fact must be of such a nature that it is the only conclusion that can fairly or reasonably be drawn, that is to say, such evidence must fairly and reasonably exclude any other explanation."

The mere fact that plaintiff's loss was discovered as a result of an inventory computation does not mean necessarily that the loss actually resulted from the shortage disclosed by the inventory. It is just as plausible to conclude from the evidence disclosed on this record that the actual shortage resulted from a failure to account for cash received from the sale of merchandise. A failure to account for such proceeds from the sale of merchandise, and the further failure to deduct such merchandise sold from the perpetual inventory, would create a shortage in the inventory. Nevertheless, the actual embezzlement, in such case, would be of money, the loss of which the plaintiff is only required by the terms of the bond in suit, to prove by evidence that "reasonably establishes that such loss was in fact due to the fraud or dishonesty of one or more" of its employees.

Plaintiff, in the present action, had to rely on circumstantial evidence to prove its loss. Even so, in order to carry the burden of proof in establishing such loss, the rule that circumstantial evidence must be such as to preclude every other hypothesis, but the guilt of the accused, does not apply in civil cases. *Rippey v. Miller, supra; Blackburn v. Insurance Co., supra; Hyder v. Hyder, supra.*

The evidence is only required to be sufficient to reasonably establish that the loss was due to the dishonest acts of Wade, as alleged. *Bottling Co. v. Casualty Co.,* 228 N.C. 411, 45 S.E. 2d 375. The charge of the court below was ample on this phase of the case, and also contained this further instruction: "If you find that there was a shortage but that it came through errors in making sales or by shoplifting or on account of negligence on the part of Wade in the way he managed the shop, that is, on account of Wade's failure to use that degree of care which an ordinarily prudent person would have exercised under the same or similar circumstances when charged with a like duty, or by a combination of these ways or that it came about in any manner other than by a fraudulent conversion on the part of Wade you would answer the first issue No."

We have carefully considered the remaining exceptions and assignments of error, and do not consider them to be of sufficient merit to warrant a disturbance of the verdict below.

In the trial below, we find

No error.