MRS. BEULAH DILLON, ADMINISTRATRIX OF THE ESTATE OF HENRY LEE DILLON, v. CITY OF WINSTON-SALEM AND WINSTON-SALEM SOUTHBOUND RAILWAY COMPANY.

(Filed 24 June, 1942.)

**1. Automobiles §§ 9c, 9f—**

The violation of the statutory requirement that the operator of a motor vehicle traveling down grade on a highway shall not coast with the gears in neutral is negligence *per se*, and the pushing in of the clutch so as to permit the vehicle to coast down grade on a highway is a violation of the statute. Sec. 127, ch. 407, Public Laws 1937.

**2. Automobiles § 9a—**

The operator of a motor vehicle is under duty, irrespective of statutory requirement, to exercise that degree of care which an ordinarily prudent person would exercise under similar circumstances, which includes the duty to keep a reasonably careful lookout and to keep the vehicle under control.

**3. Same: Automobiles § 12a—**

The duty of the operator of a motor vehicle to keep same under control requires that at night he shall not travel at a speed in excess of that at which he is able to stop within the range of his lights.

**4. Automobiles § 18a: Railroads § 11—Evidence held to show negligence on the part of driver constituting proximate cause of accident at dead-end street.**

In this action by the administratrix of a passenger in an automobile, the driver of the car, as plaintiff's witness, testified without contradiction that he was traveling east and was coasting down grade with the clutch pushed in, that as he crossed a street intersection he was blinded by the street light, that he continued without slackening speed across the intersection 49.3 feet to defendant railroad company's sidetracks, that the tracks were elevated above the level of the street so that the impact caused him to lose control of the car, and that the car continued on for a distance of more than 50 feet and hit an elevated dirt embankment on the west side of a drainage ditch maintained on the west side of the main line tracks, which were in a slight cut. There was testimony to the effect that the car hit the embankment with such force as to imbed the front of the car and drive the motor back into the front seat compartment. *Held:* The evidence discloses as a matter of law negligence on the part of the driver constituting the proximate cause of the accident or, conceding that plaintiff's evidence disclosed negligence on the part of the railroad company and the city in the maintenance and condition of the sidetrack crossing and the blockading of the street and in the failure to maintain signs or warnings, one of the proximate causes of the accident.

**5. Automobiles § 20b—**

While negligence of the driver will not ordinarily be imputed to an occupant or passenger, when it appears that the passenger has or exercises control over the driver, the negligence of the driver is imputable to the passenger irrespective of the ownership of the automobile.

**6. Same: Railroads § 11.—**

Where the uncontradicted evidence discloses that the passenger in an automobile got on the front seat and directed the driver in going to the house of the passenger's girl, it discloses that the passenger was in charge and directing the operation of the automobile so that the negligence of the driver in running the car into a railroad embankment at a dead-end street is imputable, as a matter of law, to the passenger.

**7. Same: Automobiles § 21.—**

Where the negligence of the driver is imputed to the passenger, such negligence will bar recovery by the passenger's administratrix if such negligence was a proximate cause of the injury and death, and it is not necessary that it should have been the sole proximate cause.

APPEAL by plaintiff from *Armstrong, J.,* at 9 March, 1942, Term, of FORSYTH.

Civil action to recover for alleged wrongful death. C. S., 160-161.

Evidence offered by plaintiff and elicited from her witnesses in the trial court tends to show these pertinent facts:

Henry Lee Dillon, nineteen years of age, intestate of plaintiff, came to his death about 7:30 o'clock on Sunday night, 22 December, 1940, when the Ford automobile, 1931 coach, owned by the father of, and operated by Charles W. Cranford, in which Dillon, two other boys and a girl were riding, ran into a dirt bank located east of the end of the pavement on Devonshire Street and on west side of the main line tracks, and east of sidetracks of defendant Winston-Salem Southbound Railway Company, in the city of Winston-Salem, North Carolina. At that time the driver of the Ford, then fourteen years of age, but approaching his fifteenth birthday, 18 February, 1941, had a driver's license, obtained by him through misrepresentation of his age.

Devonshire Street originally appeared on plat of property of Winston-Salem Land and Investment Company, filed for record in March, 1892, and registered in register's office of Forsyth County, North Carolina. The plat covered land at, but then outside of the corporate limits of the city of Winston-Salem, subdivided into blocks and lots, and streets and alleys. As shown on this plat, Devonshire Street runs east and west and extends from Sunnyside Avenue on the west to Lexington Street on the east—intersecting Vargrave Street and Glendale Avenue, which run north and south. Glendale Avenue, as shown, is the first street west of Lexington Street, which runs in slightly northwest and southeast course. Sprague Street is shown as the first street north of, and parallel to Devonshire Street, and Goldfloss Street is the first south thereof and parallel thereto.

Between the years 1893 and 1906 the owners of said property sold and conveyed lots with reference to this plat—and Devonshire Street was during that period used as public way for traveling on foot, and by horse

17—221

and buggy and wagon. And, in 1906, defendant Winston-Salem South-bound Railway Company bought from the then owner, and with refer-ence to said map, all the lots in the two blocks fronting on Devonshire Street west of Lexington Street and east of Glendale Avenue, except those representing two hundred fifty feet frontage on each side next to Glendale Avenue.

Thereafter, about 1909, defendant Railway Company constructed a railroad north and south across said subdivision and the land so pur-chased by it, and across Devonshire Street as represented on said plat. As so constructed the main line of the railroad cut across and below the former surface level of land covered by Devonshire Street, as so repre-sented. The Railway Company also built a passenger and freight station on said property south of Devonshire Street as so represented, and west of its main line tracks. It also constructed and laid two sidetracks on said property, west of the station and across Devonshire Street as so represented. Access to the station was provided from Devonshire Street and over the sidetracks, and then south over a dirt service road located between the tracks of the main line, and the sidetracks. But no way was provided there for crossing the main line, and Devonshire came to a "dead-end" at that point.

Thereafter, in 1923, the territory along Devonshire Street, west of Lexington Street, including the land purchased by defendant Railway Company in 1906, as above stated, was taken into the corporate limits of defendant city. Thereupon, defendant city laid pavement and curb-ing on Devonshire Street, including that section east of east curb line of Glendale Avenue down to a point 1.7 or 1.8 feet west of the west sidetrack of defendant Railway Company, a distance of 332.9 feet. At that time, defendant Railway Company conveyed to defendant city a strip of land referred to as being fifty feet wide, along the west boundary of its land, purchased as above stated, extending from Sprague Street south to and across Devonshire Street to Goldfloss Street, on which defendant city constructed a street, which is referred to as the unnamed street. Traffic going east on Devonshire may turn to left there and reach Sprague Street on which there is an overhead bridge across the railroad, or may turn to right down the railroad toward Goldfloss Street. This pavement on Devonshire Street, thirty feet wide, extends across the intersection of that street and the unnamed street, and then on east for approximately 21.5 feet, that is, approximately 71.5 feet east of the west line of the strip of land so conveyed to defendant city by defendant Railway Com-pany, and the same distance—71.5 feet—east of the west line of said intersection, and from end of this pavement, east across the sidetracks and the road leading into the railroad station, to the ditch where the Ford automobile ran into the embankment of ditch on west bank of main line tracks, the distance is 56.7 feet.

On the night of the accident here involved, there was a lighted street light located over, and approximately in the center of the paved area, and twenty-four feet east of the west line of intersection of Devonshire Street and the unnamed street, and 49.3 feet west of the west rail of the west sidetrack, that is, more than 100 feet west of the said ditch bank.

Devonshire Street, east from Glendale Avenue, is down hill to its intersection with the unnamed street. There "it flattens out," "levels out" and "is practically level." And between the intersection and the point of approach to sidetracks, the slope is slightly downward. From that point there is a dirt and cinder roadway over the sidetracks, down into the railroad yard. The dirt approach to sidetracks, overlapping the pavement irregularly but in the center beginning seven feet from the west rail, rises on eleven per cent grade. Over the tracks the road is "very nearly level," though slightly lower on east side.

The bank on the east side of main line tracks at the point in question is higher, and extends two feet above the level of the sidetracks.

Charles W. Cranford, as witness for plaintiff, testified substantially as follows: That on night of 22 December, 1940, he was driving his father's Ford coach; that three boys, including Henry Lee (Pete) Dillon, whom he did not then know, joined him in northern section of Winston-Salem; that they "picked up a girl," and then rode through the city to Southside "to see some young ladies"; that Dillon said that "he had a girl friend out there he wanted to go see"; that he, Dillon, directed the course of the automobile, and they stopped at intersection of Glendale Avenue and Devonshire Street, and Dillon exchanged seats and got on front seat; that he, the driver, had not been there before, and, in his words, "Pete told me to let him get up in front so that he could show me where he wanted to go"; that then they started east on Devonshire Street; that the street looked like a straight, through street; that there were street lights over "on the old Lexington Highway," and coming down Devonshire at night it looked like a dark block in between; that he pushed the clutch in and the car was out of gear all the way—coasting down hill; that he, Cranford, "did not know that the railroad crossed there"; that the street light at intersection with the unnamed street, using his words, "caused a glare on the windshield and blinded me, looking into the dark"; that the first time he observed that the pavement ended there was when, as he said, "We hit the railroad-spur tracks . . . traveling approximately twenty-five or thirty miles an hour"; that, again quoting, "When I hit the railroad track, I lost control of the car . . . It threw me through the top, and I had no control of it . . . my car stopped against the bank, below the spur tracks"; and that the lights and brakes on his car were in good condition.

The witness, continuing upon cross-examination as to light blinding him, said: "I don't remember where my car was when the glare of the

street light blinded me. It was approximately around the street light somewhere, close to the street light, as I was going towards the street light . . . Before I got to that street light, the glare of it blinded me. I did not make an effort to stop the car at the time. I kept on driving, although I was blinded at the time by the glare of the street light." Then, again, "The cause of this accident was not altogether being blinded by that light. There was nothing to prevent me from stopping my car . . . I didn't try to stop because you could see on the side of the street. I was blinded and couldn't see straight ahead . . . I didn't stop my car or make an effort to stop, but just went on in the darkness, not being able to see a thing, and not seeing a thing until after the car stopped."

Then continuing, on cross-examination, regarding directions by Dillon, the witness testified : "He got on the front seat because he was directing me where to go. He directed me where to go as I started on Devonshire Street . . . He did not tell me where the girl friend lived . . . He just told me where to turn from time to time as we went out in that direction. He had given me directions . . . before he got on the front seat . . . He was directing me which way to go and I was going under his direction, and driving the car as he told me to drive . . . going the way he told me to go. He knew exactly how I was driving the car"; and also said : "I do not know in which direction Pete was looking at or immediately before the accident."

This witness further testified that "just before the time we hit the spur tracks, somebody hollered something, I don't know what." And, again, "Just before we hit the tracks someone told me that we were approaching a dead-end street . . . I did not know they were telling me it was a dead-end street. They just hollered, hollered for the dead-end street. I don't know who it was."

This witness and others testified that "there was no barricade or sign or anything to show that the street ended like it did"; and that there had been a barrier on the bank at the ditch but that the plank had been knocked down, leaving only the posts. There is evidence that of the occupants of the Ford another was killed, and all others seriously injured.

The newspaperman, Harvey Dinkins, who reached the scene of the accident soon after it happened, testified : That the front of the car was completely mashed in against and embedded in the dirt embankment beyond the ditch—driven into the soil of the ditch bank; that "the motor was driven back into the front seat compartment" and "against the front seat"; that "the car was almost a total and complete wreck"; that he surveyed the whole surroundings; and that, from the intersection, after he got under the street light there looking straight ahead, he could see the bank of the main line railroad cut, and could also see the spur tracks.

The acts of negligence charged by plaintiff against defendants, briefly stated, are these : (1) That defendant Railway Company unlawfully

and negligently obstructed the uninterrupted passage of traffic on Devonshire Street at point where its tracks cross same, and that defendant city failed and neglected to prevent said Railway Company from so doing; (2) that defendant Railway Company failed to provide and maintain for traffic a proper and safe crossing at point where Devonshire Street crosses its tracks, and that defendant city failed to require the Railway Company to make such provision and maintenance; (3) that defendant Railway Company failed to erect "any signs, warning, blinkers or other signals" to indicate where "it claimed that its property began and the rights of the public to travel thereon ended," so as to warn any person about to trespass thereon; (4) that defendant city "erected and maintained a light at the intersection of Devonshire Street and the unnamed street leading to Sprague Street in such manner as to blind a traveler or obscure the view of a person proceeding on Devonshire Street toward the intersection"; (5) that both defendants (A) "failed to keep in good repair and safe condition for travel that part of the crossing at Devonshire Street which was actually open," in that (a) the west rail of the west sidetrack was placed nine inches above the level of the street, (b) the said crossing was permitted to so slope towards the east "as to make it invisible and unsafe and dangerous for travel," (c) the ditch east of the sidetracks, into which automobile in question was wrecked, was not eliminated by the laying of a culvert, or otherwise, and (d) there was no "clear and visible warning of the existence of said ditch"; (B) "failed to erect any warning, signals, signs, barricades, blinkers, or other devices to warn or notify the public or any person traveling east on Devonshire Street of the existence of a railroad crossing or of any of the conditions" there; (C) created and maintained such conditions as alleged at the point of the accident as amounted to an invitation to the traveling public, including plaintiff's intestate, to use and travel on Devonshire Street east of Glendale Avenue upon the assumption that it was "an open, continuous and unbroken street" until too late for "plaintiff's intestate in the exercise of ordinary care to avoid and to extricate himself from the danger in which he had been placed by the wrongful conduct of the defendants"; and (D) failed to correct such dangerous conditions after they had notice of their existence.

Defendants, in separate answers filed, deny the allegations of negligence as set out in the complaint, and, by way of further defense, summarily stated, plead that negligence of Charles W. Cranford, fourteen years of age, in operating the automobile, on joint enterprise, under direction of plaintiff's intestate, (1) at unlawful and reckless rate of speed, (2) without having and keeping same under control, (3) without keeping a proper lookout, (4) carelessly and heedlessly, in a willful and wanton disregard of the rights and safety of others, (5) without due caution and circumspection and at a speed so as to endanger or be likely

to endanger persons riding therein, and (6) in violation of the Motor Vehicles Laws of the State of North Carolina, is the sole proximate cause, or, at least, a contributing cause of the death of plaintiff's intestate; and that such negligence is imputable to plaintiff's intestate; but that if defendants or either of them were negligent in any of the respects alleged, such negligence is insulated by that of Charles W. Cranford, operator of the automobile.

At the close of evidence offered by plaintiff, each of defendants demurred thereto and moved for judgment as of nonsuit under C. S., 567. The motions were allowed—and in accordance therewith judgment was entered.

Plaintiff appeals to Supreme Court and assigns error.

*Elledge & Wells and Ratcliff, Hudson & Ferrell for plaintiff, appellant.*

*Fred M. Parrish and Craige & Craige for defendant Winston-Salem Southbound Railway Company, appellee.*

*Womble, Carlyle, Martin & Sandridge for City of Winston-Salem, appellee.*

WINBORNE, J. While there are other assignments of error on this appeal, only that which challenges the correctness of the judgment as of nonsuit requires consideration. And, as to that, we agree with lower court.

If it be conceded that there is sufficient evidence, as against either or both defendants, to require the submission of an issue or issues of negligence, we are of opinion that the evidence, offered by plaintiff, clearly establishes that the driver, in the operation of the automobile in which intestate was riding when fatally injured, is, upon his own statement, guilty of negligence, which, as a matter of law, if not insulating any negligence of defendants, under principle enunciated in *Smith v. Sink,* 211 N. C., 725, 192 S. E., 108; *Powers v. Sternberg,* 213 N. C., 41, 195 S. E., 88; *Butner v. Spease,* 217 N. C., 82, 6 S. E. (2d), 808; *Chinnis v. R. R.,* 219 N. C., 528, 14 S. E. (2d), 500; *Reeves v. Staley,* 220 N. C., 573, 18 S. E. (2d), 239; *Peoples v. Fulk,* 220 N. C., 635, 18 S. E. (2d), 147; and *Jeffries v. Powell, ante,* 415, at least proximately contributed to the injury and death of intestate, *Weston v. R. R.,* 194 N. C., 210, 139 S. E., 237; *Lee v. R. R.,* 212 N. C., 340, 193 S. E., 395; *Beck v. Hooks,* 218 N. C., 105, 10 S. E. (2d), 608; *Sibbit v. Transit Co.,* 220 N. C., 702, 18 S. E. (2d), 203, and that the negligence of the driver is imputable to intestate who was directing the operator of the automobile.

It is provided by statute in this State that "The driver of a motor vehicle when traveling upon a down grade on any highway shall not coast with the gears of such vehicle in neutral." Public Laws 1937,

ch. 407, sec. 127. The violation of such statute is negligence *per se,* and, if injury to the violator proximately result therefrom, it would bar his right to recover therefor.

Furthermore, it is a general rule of law, even in the absence of statutory requirement, that the operator of a motor vehicle must exercise ordinary care, that is, that degree of care which an ordinarily prudent person would exercise under similar circumstances. In the exercise of such duty it is incumbent upon the operator of a motor vehicle to keep a reasonably careful lookout and to keep same under such control at night as to be able to stop within the range of his lights. *Weston v. R. R., supra; Lee v. R. R., supra; Beck v. Hooks, supra; Sibbit v. Transit Co., supra.*

In *Weston v. R. R., supra,* speaking to a factual situation somewhat similar to that here, this Court said: "The general rule under such circumstances is thus stated in Huddy on Automobiles, 7 Ed., 1924, sec. 296. 'It was negligence for the driver of the automobile to propel it in a dark place in which he had to rely on the lights of his machine at a rate faster than enabled him to stop or avoid any obstruction within the radius of his light, or within the distance to which his lights would disclose the existence of obstructions . . . If the lights on the automobile would disclose obstructions only ten yards away it was the duty of the driver to so regulate the speed of his machine that he could at all times avoid obstructions within that distance. If the lights on the machine would disclose objects further away than ten yards, and the driver failed to see the object in time, then he would be conclusively presumed to be guilty of negligence, because it was his duty to see what could have been seen' " This principle has been brought forward and applied in *Lee v. R. R., supra; Beck v. Hooks, supra;* and *Sibbit v. Transit Co., supra,* and held applicable to factual situation in *Clarke v. Martin,* 217 N. C., 440, 8 S. E. (2d), 230.

And in *Beck v. Hooks, supra,* the rule is stated in this way:

"It is not enough that the driver of plaintiff's automobile be able to begin to stop within the range of his lights, or that he exercise due diligence after seeing defendants' truck on the highway. He should have so driven that he could and would discover it, perform the manual acts necessary to stop, and bring the automobile to a complete stop within the range of his lights. When blinded by the lights of the oncoming car so that he could not see the required distance ahead, it was the duty of the driver within such distance from the point of blinding to bring his automobile to such control that he could stop immediately, and if he could not then see, he should have stopped. In failing to so drive he was guilty of negligence which patently caused or contributed to the collision with defendant's truck, resulting in injury to plaintiff," the owner and passenger.

Applying this principle to the evidence in case in hand, it affirmatively appears: (1) That the driver of the automobile, by pushing the clutch in, had thrown the car out of gear, and was permitting it to coast down hill. This was negligence *per se.* (2) That the driver was blinded by the glare of the street light. If as he says he was blinded as he "was going towards the street light," it occurred more than 49.3 feet before he reached the sidetracks—that being the distance from the light to the sidetracks; and it occurred more than one hundred feet from the ditch bank. Yet he continued to drive blindly, and made no effort to slacken the speed at which he was traveling, or to stop as the circumstances required. Such conduct is negligence. Moreover, paraphrasing in part the words of *Stacy, C. J.,* in *Powers v. Sternberg, supra,* there are a few physical facts here which speak louder than words. The force with which the automobile ran into the dirt embankment, "with its attendant destruction and death, establishes the negligence of the driver of the car as the proximate cause," or at least a proximate cause, of the injury and death of intestate.

Also, the principle prevails in this State that negligence on the part of the driver of an automobile will not, as a rule, be imputed to another occupant or passenger unless such occupant is the owner of it, or has some control over the driver. *Hunt v. R. R.,* 170 N. C., 442, 87 S. E., 210, and numerous other cases.

This principle recognizes that where it appears that the passenger has or exercises control over the driver, negligence of the driver is imputable to the passenger. See *Williams v. Blue,* 173 N. C., 452, 92 S. E., 270, where the Court said: "Ownership of an automobile is not essential to charge one with responsibility for its operation . . . One in charge of operation of a motor vehicle, although he is neither the owner nor the person actually operating it, is nevertheless liable for injury sustained by third persons by reason of its negligent operation, as the person actually operating the vehicle will be deemed his servant irrespective of whether he employed him or not. 28 Cyc., p. 40."

Applying this principle to the present case the undisputed testimony of the driver is susceptible of only one meaning, and that is, on the trip in question the intestate of plaintiff was in charge, and directing the operation of the automobile. Under such circumstances the negligence of the driver is imputed to him.

It is sufficient to defeat recovery if the negligence of the driver, imputed to intestate of plaintiff, was a proximate cause of the injury and death of the intestate. It need not be the sole proximate cause.

Consideration of other exceptions fails to reveal cause for disturbing the rulings of trial court.

The judgment below is

Affirmed.