## E. G. MORRIS v. JENRETTE TRANSPORT COMPANY.

(Filed 21 May, 1952.)

**1. Negligence § 1—**

Actionable negligence is the failure to exercise proper care in the performance of some legal duty which defendant owes plaintiff under the circumstances when injurious result can be reasonably foreseen by a man of ordinary prudence, which failure produces the injury in continuous sequence and without which it would not have occurred.

**2. Automobiles § 8d—**

Uncontradicted evidence tending to show that the accident in suit occurred before the driver of defendant's truck had time to get out of the cab after the truck stopped because of motor failure does not show "a parking" within the meaning of G.S. 20-161 (a), and further fails to show a violation of the provision of the statute requiring the display of flares or warning signals around a disabled vehicle, since the statute contemplates that the driver should have a reasonable time within which to display such signals.

**3. Same: Automobiles § 18b—**

Plaintiff's evidence to the effect that he was driving forty-two miles per hour on a rainy, misty night, was blinded by the lights of an oncoming vehicle and did not see defendant's truck, which was stopped on the highway, until within fifteen or eighteen feet of the truck, *is held* to show a want of proximate cause between the failure of the truck to have lights burning on its rear and the accident in suit, even if it be conceded that defendant's testimony that he saw no lights is sufficient for the jury on the question of violation of G.S. 20-129 (a) (c) (d).

**4. Automobiles § 8d—**

Testimony of witnesses that no lights were burning upon a vehicle after it had had a violent collision with another vehicle on the highway has no

probative force upon the question of whether such vehicle had lights burning at the time of the collision.

**5. Automobiles §§ 8d, 18h (3)—Evidence held to show contributory negligence as a matter of law on part of plaintiff in outrunning range of his lights.**

> Plaintiff's evidence tended to show that he was traveling forty-two miles per hour on a rainy, misty night, that he was blinded by the lights of an oncoming vehicle and did not see defendant's truck, which was stopped on the highway in his lane of traffic, until within fifteen or eighteen feet thereof, that he immediately applied his brakes and swerved to the left but was unable to avoid colliding with the rear of the truck, *is held* to disclose contributory negligence on the part of plaintiff as a matter of law in outrunning the range of his lights and traveling at excessive speed under the existing conditions. G.S. 20-141.

**6. Automobiles § 8d—**

> While a driver is not under duty to anticipate negligence on the part of others traveling the highway, it is his duty to anticipate the presence of others and hazards of the road, such as a disabled vehicle, and to keep his automobile under such control in the exercise of due care as to be able to stop within the range of his lights.

APPEAL by plaintiff from *Godwin, Special Judge,* at January Civil Term, 1952, of WAKE.

Civil action to recover for personal injury and property damage allegedly resulting from actionable negligence of defendant,—in which upon trial in Superior Court a nonsuit was entered at close of plaintiff's evidence.

Plaintiff alleges in his complaint, in substance, these facts:

1. That about the hour of 7:15 p.m. on 3 November, 1949, plaintiff's automobile, driven by him, and traveling in a southeast or southerly direction on State Highway No. 87, which runs from Sanford to Fayetteville, in the State of North Carolina, came into collision with the rear end of defendant's tractor-trailer operated by duly authorized agent of defendant, and traveling from Sanford to Fayetteville, at a point about six miles south of Sanford.

2. That the tractor-trailer of defendant was negligently parked on the highway without lights on it, or flares upon the highway.

3. That he, the plaintiff, "was driving in a careful and prudent manner with his lights burning, operating his automobile at a speed of approximately 40 miles per hour, driving on his right-hand side of said highway, keeping a careful and proper lookout and in all respects complying with all the laws of North Carolina in such cases made and provided and all moral rules of safety. That as aforesaid, the weather was inclement and raining, and visibility was difficult. That as the plaintiff approached within a short distance of defendant's tractor-trailer motor vehicle . . .

another car approached the plaintiff from the opposite direction with bright lights burning. That the bright lights of the approaching automobile blinded plaintiff and he immediately applied his brakes and slowed down as fast as he could, but as he cleared and passed by the approaching automobile the parked truck and trailer of the defendant loomed suddenly and immediately in front of his automobile . . . That the plaintiff confronted with this sudden dangerous situation . . . immediately cut his car to the left but the distance was so short that he failed to cut completely to the left side of the road, ran into the rear of said large tractor-trailer motor vehicle of defendant . . .," to his personal injury, and damage to his automobile.

And, as the proximate cause of such injury and damage, plaintiff alleges in four paragraphs acts of negligence on the part of defendant which may be summarized as follows: (1) That defendant, knowing that there was motor trouble in connection with its tractor-trailer, negligently failed to have it repaired in the daytime of the day of the collision, and thus "caused a breakdown to occur in the night time," and (2) that defendant unlawfully and negligently parked its tractor-trailer in and blocking the right lane of a public highway, in the nighttime, while it was raining, and permitting it to remain on the highway without lights, or flares, or person to warn traffic approaching from the rear.

Defendant, answering the allegations of the complaint, admits (1) that on 3 November, 1949, its tractor-trailer, used in the conduct of its business, and operated by its authorized agent, was being run, at the time of the matters and things of which complaint is made, in a southeasterly direction along highway No. 87, and (2) that the weather was inclement, that it was raining and that the visibility was difficult. And in answer to the paragraph in which plaintiff alleges that he was "operating his automobile at a speed of approximately 40 miles per hour," defendant admits "that the plaintiff was . . . operating his automobile at a speed greater than was reasonable and prudent under the circumstances then and there existing."

And for a further answer and defense, defendant avers: That at the time and place alleged in the complaint defendant's tractor-trailer became disabled, in that its motor ceased to properly function, thereby causing the vehicle to stop upon the highway; that the driver thereof drove it as far to his right of the highway as it was possible for him to do under the circumstances before it came to a complete stop; and that, within a matter of moments thereafter, the automobile operated by plaintiff at a high, reckless and dangerous rate of speed, ran into and collided with the vehicle of defendant.

And defendant pleads in bar of this action the contributory negligence of plaintiff as a proximate cause of his injury and damage in that:

Plaintiff (a) failed to have his automobile equipped with proper lights or failed to keep a proper lookout under the circumstances and conditions then and there existing; (b) was operating his automobile in a careless and negligent manner and at a high, reckless and dangerous rate of speed; and (c) was operating his automobile without adequate or proper brakes, or failed to properly use his brakes, and to have his automobile under control, and negligently and carelessly failed to avoid collision with the vehicle of defendant.

Upon trial in Superior Court plaintiff, as witness for himself, testified: "I was living at Sanford, N. C., at time I was injured on November 3, 1949 . . . I was driving my automobile on Highway 87 in Lee County about 6 miles south or southeast of Sanford. I had a collision with a tractor-trailer belonging to the Jenrette Transport Company . . . I was driving on my right of way . . . from 40 to 45 miles an hour. I could not say definitely but I remember seeing my speedometer; it was cloudy and I had just gone through a shower of rain and had slowed down and glanced down and I was making right at 42 miles an hour at the time I saw it. There was a shower of rain just before I had this wreck. There was a fog—seemed like . . . getting up from the cement a piece and I was going slightly upgrade. I met an approaching car with very bright lights. I dimmed mine and he didn't dim his and I threw mine back on brights and I dimmed them a second time, and he didn't dim his lights and I left mine on him. I was completely blinded by the bright lights of the approaching car. I cut my speed down. I raised my foot off the accelerator and slowed down some. I was about 125 or 150 feet from the parked tractor-trailer of the Jenrette Transport Company when I was blinded by this passing car. Just as the car that was meeting me passed I saw a truck in front of me and I said 'God spare my life,' and by the time I said 'life' by the time I got by that automobile, I had already hit it. I pulled to my left. I had my foot on the brake . . . just as tight as I could have . . . at the time I hit the truck and the gravel was what caused my car not to stop quicker. When I first saw the truck I was about 15 to 18 feet from it. The truck was still. There were no lights on the rear of the truck and there were no flares out around the truck. Everything was dark and I didn't see it until it just loomed right up on me. There was nobody out there with a flashlight to give any warning. When I hit the truck I passed out . . . The . . . tractor-trailer blocked three-fourths of my right lane of traffic. The . . . tractor-trailer truck was within 18 or 20 inches of the middle line of the highway, that is, the left rear tires. There was a 6 to 8 foot shoulder to the right of the truck."

Then on cross-examination plaintiff continued: "I left Sanford a little while before this happened. I was heading south towards Fayetteville . . . I had about 350 pounds of merchandise in the car . . . I was some-

where between Sanford and where I had the wreck when a shower of rain came up. I ran through the shower. It had not completely quit raining at the time. The shower had gone and it came a little drizzle and a fog arising. It was foggy at the time I met the car . . . I couldn't see whether the road ahead of me was straight or curved about the place where the wreck occurred. I had never been on that road before one time before and that was in the daytime. I have been there since . . . I don't know of my own knowledge where the truck was . . . only what somebody showed me. I was completely blinded . . . just a short time. I couldn't say definitely how far I went while I was blinded but it was just a matter of seconds. I was blinded all the time from 125 to 150 feet, from the time he blinded me until the truck loomed up in front of me . . . At the time he blinded me I would say I went approximately 125 to 150 feet absolutely blinded because I was driving 42 miles an hour. I could not have seen that truck if I had looked good ahead, not when the car was there, not before I met it because I was on an up-cline . . . a slight up-cline. I wasn't completely blinded and I did not say I was completely blinded . . . I say I was blinded . . . I couldn't see it (the truck) at the time I was meeting the car . . . I'll say for 5 or 6 seconds . . . I didn't see it until the bright lights had passed by and that is whenever I saw it . . . At that time I would say my speed was approximately 25 miles per hour . . . I cut to the left all I could in that short space, . . . right front wheel and . . . fender from about half of the car ran on right up under the truck body on the left . . . The corner of his truck came right into the right hand side of my car all the way back and smashed it down to the seat. At the moment I saw it I put on my brakes as hard as I could. I had been driving 50 to 55 miles an hour according to the law . . . I had slowed down to 42 miles an hour . . . a mile or more away from there . . . At the time I met the car I was still making about the same speed—42 miles an hour at the time I met him . . . I am swearing that there were no lights burning on the truck, nowhere on the rear of the truck that I could see there."

O. C. McBryde, a deputy sheriff, testified: ". . . I went out and investigated the wreck on the night of November 3, 1949 . . . I went there as an officer of the law . . . Whenever I got there they were loading Mr. Morris onto the ambulance and Mr. Morris' car had swerved to the left so that the front edge of his car was out past the white line in the center of the road. That is the left front . . . I would say around 4 feet of the back of the truck was in the highway on the hard surface. There was no lights on the back of the truck at that time but the driver had a big stop light right in the middle of the truck under the body, and that didn't work. I had him put his foot on the brake, asked him to do that and it didn't work. He cut the other lights on the truck and he had some

clearance lights as well as I remember, and then this big light. When I got there nothing was showing except the one headlight which was still burning on Mr. Morris' car. The other one on there was, of course, knocked out . . . The visibility was bad . . . It was misty and foggy. The top and front of the windshield of Mr. Morris' car was all crushed down to . . . the back of the front seat. The car wasn't worth much after the wreck, I would say just junk . . ."

Then on cross-examination the witness continued: "I would say I got to the scene of the wreck some 15 or 20 minutes after it happened . . . The left side of the truck was approximately 4 feet on the highway. It was about half on and half off. The highway is just a little bit higher than the shoulder where the hard surface breaks off there and it had a slope into the side ditch. I don't remember how wide the shoulder was there but that was my impression that since it had been raining it was probably as close as he could get to the ditch without maybe sliding on in. The width of the pavement at that place was approximately 22 feet . . . The shoulders were probably a little over 4 feet . . . The road had two traffic lanes with a center line in it. . . . I talked to the driver of the truck. He said he had had trouble with the truck, had started and had driven some little distance . . . when it knocked off again. That they started pulling it off the highway and got it as far as he could get it and that he looked in his rear mirror and saw the headlights coming, that he put his foot on the brake pedal to operate it and that it was connected with the stop light in the back, that he started using that as a signal, that he didn't have time to get out of the cab. . . . Immediately after he stopped he saw the other car coming and hadn't had time to get out before it hit him. That stop light was located in the center under the body of the truck. It was an 8 inch light . . . There was nothing covering this light when I saw it. As well as I recall it was located below the body proper, and most of them are fastened in the center of the chassis. The lights would burn. The tail light was pulled loose and laying up, either on the bumper or on the fender . . . That was the light where the car ran under and . . . into. It was broken loose from the truck. The driver told me that his clearance lights were burning when he stopped."

Then on re-direct examination the deputy sheriff continued: "My recollection was that the driver told me he had been stopped and they had worked on the . . . truck nearer to Sanford than where the collision occurred· . . . He said they had got it started, and . . . they had driven it on down the highway from Sanford when . . . it knocked off again . . . I believe the driver told me that he phoned to Raleigh for a mechanic . . . I'd say Raleigh was about 55 miles away from the scene of the wreck. There are good mechanics in Sanford. The driver said he had a mechanic from Raleigh . . . He told me that Mr. Jenrette and

the mechanic were walking back from the car, that they were right in front of him."

And on recross-examination the deputy sheriff concluded: "I would say in the next hundred yards past the scene of the wreck to the south there is an incline to the left,—a gradual curve . . . That is a rough road to identify skidmarks . . . Now where this car had started, I would say 8 feet or maybe 10 feet back of the truck you could see where he cut the gravel when he cut to the left. You could see the curve of the front wheel where it cut to the left."

And plaintiff offered other witnesses whose testimony tends to show that they arrived at the scene soon after the collision; that the pavement was 16 feet wide; that the truck was half on and half off the pavement; that they saw no lights on the truck; that they saw no flares on the highway; and that it was rainy and foggy. One witness, M. J. Yarborough, said: "Oh, yes, it was so foggy that you would have to take your time. It wasn't a night to be running too fast."

Motion of defendant for judgment as of nonsuit entered at the close of plaintiff's evidence was allowed, and, in accordance therewith, judgment was entered. Plaintiff appeals to Supreme Court, and assigns error.

*Thos. W. Ruffin for plaintiff, appellant.*
*Clem B. Holding for defendant, appellee.*

WINBORNE, J. When the evidence offered by plaintiff, as shown in the record on this appeal, is taken in the light most favorable to him, is there sufficient evidence to take the case to the jury? The trial court ruled in the negative, and we approve.

In order to establish actionable negligence plaintiff must show (1) that there has been a failure to exercise proper care in the performance of some legal duty which defendant owed to plaintiff, under the circumstances in which they were placed; and (2) that such negligent breach of duty was the proximate cause of the injury—a cause that produced the result in continuous sequence, and without which it would not have occurred, and one from which any man of ordinary prudence could have foreseen that such result was probable under all the facts as they existed. *Whitt v. Rand,* 187 N.C. 805, 123 S.E. 84, and numerous other cases.

Tested by this rule, it may be fairly doubted that there is shown any evidence of actionable negligence on the part of defendant in the present action. The uncontradicted statement of defendant's driver, offered in evidence by plaintiff through his witness, the deputy sheriff, refutes the theory of "a parking" of defendant's tractor-trailer at the place of the collision in question, within the meaning of the statute, G.S. 20-161 (a) as amended by Chap. 165 of 1951 Session Laws of North Carolina. The

statute declares that "No person shall park or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled portion of any highway, outside of a business or residence district, when it is practicable to park or leave such vehicle standing off of the paved or improved or main traveled portion of such highway."

And the terms "park" or "leave standing" as used in this statute have been interpreted by this Court as meaning "something more than a mere temporary or momentary stop on the road for a necessary purpose." 42 C.J. 613. *Stallings v. Transport Co.,* 210 N.C. 201, 185 S.E. 643; *Peoples v. Fulk,* 220 N.C. 635, 18 S.E. 2d 147; *Leary v. Bus Corp.,* 220 N.C. 745, 18 S.E. 2d 426; *Pike v. Seymour,* 222 N.C. 42, 21 S.E. 2d 884; *Morgan v. Coach Co.,* 225 N.C. 668, 36 S.E. 2d 263.

In *Peoples v. Fulk, supra,* in opinion by *Barnhill, J.,* it is said: "Starting and stopping are as much an essential part of travel on a motor vehicle as is 'motion.' Stopping for different causes, and according to the exigencies of the occasion, is a natural part of travel. The right to stop when the occasion demands is incident to the right to travel"—citing cases.

Hence, plaintiff's car having approached before the driver of the defendant's tractor-trailer had time, after it stopped, to get out of the cab, the tractor-trailer was not parked or left standing upon the paved portion of the highway in violation of the above quoted provision of G.S. 20-161 (a).

True, there is a proviso to G.S. 20-161 (a) which reads: "That in the event that a truck, trailer or semi-trailer be disabled upon the highway that the driver of such vehicle shall display, not less than 200 feet in the front and rear of such vehicle, a warning signal . . . after sundown red flares or lanterns . . . ." But this statute contemplates that the driver shall have a reasonable time within which to perform this duty of displaying warning signals. The law will not hold him to be negligent in failing to do that which he has not had time to do. Hence, we hold that, in the light of the uncontradicted statement of the driver of defendant's tractor-trailer, that the plaintiff's car approached before he had time to get out of the cab, so offered in evidence by plaintiff, a violation of the provisions of this proviso is not made to appear.

Now, then, is there evidence that the tractor-trailer of defendant was permitted to be on the highway without lights?

The statute, G.S. 20-129, declares when vehicles must be equipped with lights. Subsection (a) reads: Every vehicle upon a highway within this State during the period from a half hour after sunset to a half hour before sunrise, and at any other time where there is not sufficient light to render clearly discernible any person on the highway at a distance of two hundred feet ahead, shall be equipped as in this section respectively required

for different classes of vehicles, and subject to exemption with reference to lights on parked vehicles as declared in G.S. 20-134.

And subsections (d) and (e) pertain to rear lamps and clearance lamps respectively.

In this connection, the deputy sheriff, in his testimony, refers to a big stop light under, and clearance lights and tail light on defendant's tractor-trailer, and stated that the driver of the tractor-trailer said that, seeing the headlights coming, "he put his foot on the brake pedal to operate it . . . that it was connected with the stop light in the back, that he started using that as a signal . . .," and "that his clearance lights were burning when he stopped."

On the other hand, plaintiff who, according to his own statement was completely blinded, and traveling at speed of forty-two miles an hour until about 15 to 18 feet from the tractor-trailer, when he first saw it, testified that "there were no lights on the rear of the truck," and, again, "that there were no lights burning on the truck,—nowhere on the rear that I could see there."

If it be conceded that this testimony of plaintiff tends to show that defendant did not have lights on the rear of the tractor-trailer, the mere statement, in connection with surrounding circumstances, clearly shows that the absence of lights was not a proximate cause of the collision. Hence there is no evidence of actionable negligence in support of the allegations of the complaint.

And it may be noted that all other testimony as to lights on the tractor-trailer was from witnesses who arrived at the scene after the collision. Their testimony that at that time there were no lights on the tractor-trailer has no probative force upon the question as to whether the rear lights of the tractor-trailer were burning at the time of the collision. See *Peoples v. Fulk, supra.*

But if it be conceded that defendant was negligent in some respect alleged in the complaint, it is manifest from the evidence that the speed at which plaintiff was driving his automobile was the proximate cause, or at least one of the proximate causes of his injury and damage. The case comes within and is controlled by the principles enunciated and applied in *Weston v. R. R.*, 194 N.C. 210, 139 S.E. 237; *Lee v. R. R.*, 212 N.C. 340, 193 S.E. 395; *Beck v. Hooks*, 218 N.C. 105, 10 S.E. 2d 608; *Sibbitt v. Transit Co.*, 220 N.C. 702, 18 S.E. 2d 203; *Dillon v. Winston-Salem*, 221 N.C. 512, 20 S.E. 2d 845; *Pike v. Seymour*, 222 N.C. 42, 21 S.E. 2d 884; *Allen v. Bottling Co.*, 223 N.C. 118, 25 S.E. 2d 388; *Atkins v. Transportation Co.*, 224 N.C. 688, 32 S.E. 2d 209; *McKinnon v. Motor Lines*, 228 N.C. 132, 44 S.E. 2d 735; *Riggs v. Oil Corp.*, 228 N.C. 774, 47 S.E. 2d 254; *Tyson v. Ford*, 228 N.C. 778, 47 S.E. 2d 251; *Cox v. Lee*, 230 N.C. 155, 52 S.E. 2d 355; *Brown v. Bus Lines*, 230

N.C. 493, 53 S.E. 2d 539; *Hollingsworth v. Grier,* 231 N.C. 108, 55 S.E. 2d 806; *Baker v. R. R.,* 205 N.C. 329, 171 S.E. 342; *Montgomery v. Blades,* 222 N.C. 463, 23 S.E. 2d 844. See also *Marshall v. R. R.,* 233 N.C. 38, 62 S.E. 2d 489.

In this connection, the speed statute, G.S. 20-141, as rewritten in Sec. 17, Chap. 1067 of 1947 Session Laws of N. C., declares in pertinent part:

(a) "No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions then existing.

(b) "Except as otherwise provided in this chapter, it shall be unlawful to operate a vehicle in excess of the following speeds:

(1) Twenty miles per hour in any business district;

(2) Thirty-five miles per hour in any residential district;

(3) . . . ;

(4) Fifty-five miles per hour in places other than those named in paragraphs 1 and 2 of this subsection for passenger cars . . .;

(c) "The fact that the speed of a vehicle is lower than the foregoing limits shall not relieve the driver from the duty to decrease speed . . . when special hazard exists with respect to pedestrians or other traffic or by reason of weather or highway conditions, and speed shall be decreased as may be necessary to avoid colliding with any person, vehicle or other conveyance on the highway in compliance with legal requirements and the duty of all persons to use due care."

In this connection this Court, in *Weston v. R. R., supra,* speaking through *Brogden, J.,* to a factual situation somewhat similar to that here, had this to say: "The general rule under such circumstances is thus stated in Huddy on Automobiles, 7 Ed. 1924, sec. 296: 'It was negligence for the driver of the automobile to propel it in a dark place in which he had to rely on the lights of his machine at a rate faster than enabled him to stop or avoid any obstruction within the radius of his lights, or within the distance to which his lights would disclose the existence of obstructions . . . If the lights on the automobile would disclose obstructions only ten yards away it was the duty of the driver to so regulate the speed of his machine that he could at all times avoid obstructions within that distance. If the lights on the machine would disclose objects further away than ten yards, and the driver failed to see the object in time, then he would be conclusively presumed to be guilty of negligence because it was his duty to see what could have been seen.' " This principle has been brought forward and applied in *Lee v. R. R., supra; Beck v. Hooks, supra; Sibbitt v. Transit Co., supra; Dillon v. Winston-Salem, supra,* and others.

In *Beck v. Hooks, supra,* the rule is stated in this way: "It is not enough that the driver of plaintiff's automobile to be able to begin to stop within the range of his lights, or that he exercise due diligence after

19—235

seeing defendants' truck on the highway. He should have so driven that he could and would discover it, perform the manual acts necessary to stop, and bring the automobile to a complete stop within the range of his lights. When blinded by the lights of the oncoming car so that he could not see the required distance ahead, it was the duty of the driver within such distance from the point of blinding to bring his automobile to such control that he could stop immediately, and if he could not then see, he should have stopped. In failing to so drive he was guilty of negligence which patently caused or contributed to the collision with defendants' truck, resulting in injury to plaintiff."

In the light of the provisions of the statute, G.S. 20-141, as so rewritten, the contributory negligence of plaintiff clearly appears from his own testimony and the physical facts shown in the evidence. He says that while completely blinded by the bright lights of an oncoming car, he drove "for 5 or 6 seconds" at a speed of forty-two miles per hour, a distance he gives as "125 to 150 feet," but mathematically calculated for the time and at that speed, 305 to 360 feet. "Such is the stuff of which wrecks are made," wrote *Stacy, C. J.,* in *McKinnon v. Motor Lines, supra.*

While plaintiff was under no duty to anticipate negligence on the part of others traveling the highway, it was his duty to anticipate presence of others, *Hobbs v. Coach Co.,* 225 N.C. 323, 34 S.E. 2d 211, and hazards of the road, such as disabled vehicles, and, in the exercise of due care, to keep his automobile under such control as to be able to stop within the range of his lights.

The judgment of nonsuit entered below will be, and it is hereby

Affirmed.